Ralph Edward PLOTNER, Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-84-772.

Court of Criminal Appeals of Oklahoma.

July 15, 1988.

Rehearing Denied Aug. 30, 1988.

## ORDER

Mac Oyler & Mary Bane, Oyler & Bane, Oklahoma City, for appellant.

Michael C. Turpen, Atty. Gen., David W. Lee, Susan Stewart Dickerson, Asst. Attys. Gen., Oklahoma City, for appellee.

## OPINION

GORDON R. MELSON,* Assigned Judge:

Appellant, Ralph Edward Plotner, Jr., was tried by jury and convicted of Attempted First Degree Rape (Count I) (21 O.S. 1981, § 42) (21 O.S.Supp.1983, § 1114), and Forcible Sodomy (Count II) (21 O.S.1981, § 888), in Oklahoma County District Court, Case No. CRF–83–6297, before the Honorable Karl R. Gray, District Judge. He was sentenced respectively to fifteen (15) and five (5) years imprisonment. We affirm in part, and reverse in part.

On November 6, 1983, the prosecutrix, J.R.B., accepted an invitation from Dr. Thomas Fraley, a married physician, to join him and two friends, appellant and Ralph Goodger, for dinner at Joe Kelly's Restaurant. Between 8:00 and 11:30 p.m., the party consumed numerous alcoholic beverages, and an intermittent quarrel occurred between J.R.B. and Fraley over her dating other men. When Fraley's raucousness disturbed nearby patrons, the management refused further service and the four departed around 11:30 p.m. in three separate cars to J.R.B.'s apartment.

At the apartment complex, Fraley's loud and disruptive behavior continued as he kicked the door, and resumed the previous argument inside J.R.B.'s apartment. Appellant and Goodger decided to take Fraley home, but before they left a police officer arrived in response to a disturbance complaint. Upon determining that Fraley and Goodger were too intoxicated to drive, the officer allowed appellant to drive them home. When J.R.B. objected to leaving Fraley's car at her apartment, the four decided she would drive it, while Fraley and Goodger rode with appellant. After dropping Fraley off at his home, appellant, J.R.B., and Goodger returned to Joe Kelly's parking lot, where Goodger got into his car and departed.

Appellant and J.R.B. returned to her apartment between 1:45 and 2:00 a.m., where they had a brief conversation with the guard. J.R.B. invited appellant inside for a coke, and they talked until around 2:30 a.m. about Fraley's jealousy and her need to date other men. Although appellant testified that he left her apartment without incident, J.R.B. said appellant leaned over into her lap and stated, "I'm going to f—— you." Stunned, J.R.B. suggested appellant leave. Instead, he reached under her dress and grabbed her pantyhose, jerking her to the floor. After he threatened her with serious harm, J.R.B. removed her clothes. Appellant forced her upstairs and onto her bed, where he undressed and began kissing her body, then committed oral sodomy on her— against her will and without consent.

As appellant was positioning himself for other sexual acts, J.R.B. slipped away and ran down the stairs, closely pursued by appellant. When J.R.B. opened the front door, she heard a crash and was jerked to the floor by her hair. At this point, her forehead was bleeding and she had a broken arm. Appellant shut the door, then said "Now you're going to die, bitch," and that he would now finish what he came to do. Appellant told J.R.B. he injured his foot chasing her down the stairs. After she stopped the bleeding from her forehead with a towel, she complied with appellant's demand that she wipe up the blood from the tiled floor.

* GORDON R. MELSON, Presiding Judge of the South-Central Judicial Administrative District was appointed to sit in place of the Honorable HEZ J. BUSSEY, who filed his disqualification in this case.

Appellant ordered J.R.B. onto the dining room floor, where he attempted to have sexual intercourse with her; he was unable to do so, because he could not achieve an erection. He said he would "get her" if she "told" anyone. After she agreed not to tell, the two got dressed. J.R.B. refused appellant's offer to take her to a hospital, but instead drove herself to Mercy Health Center, arriving around 4:00 a.m. J.R.B. told Dr. Steven Conner and attending nurses that her broken arm and cut forehead were caused by a fall down the stairs. She said she did not implicate appellant initially, because of his threats. Later that morning, she told her mother, sister, and a male friend that she suffered the injuries while attempting to escape appellant's sexual assault. Although not impossible, Dr. Conner and Dr. Bruce Saylor testified that it was unlikely that J.R.B.'s arm was broken by a fall; instead, it was more consistent with having been slammed with a heavy door.

J.R.B.'s attorney reported the incident to Oklahoma City police on November 22 and 23, 1983. On November 28, 1983, J.R.B. gave a statement to police and authorized a search of her apartment for corroborating evidence. This search was conducted on December 15, 1983. A police investigator observed a "reddish" film or stain on the tile floor that appeared to be blood, but it was not tested. Scratch marks and other damage found on the inside of the front door appeared to have been caused by a watch, ring, or bracelet striking the door with great force. One of ten hairs found on the bedsheet was consistent with appellant, while the other nine were consistent with J.R.B. or of unknown origin.

A few days later, appellant volunteered his gold Rolex watch to the police for analysis. Special Agent Robert Webb, FBI chemist, testified that paint chips found on the watchband originated from the paint on the inside of J.R.B.'s apartment door. He admitted there were some differences in the trace elements, but believed the paints matched, though not conclusively. Appellant's expert, Charles Powell of the EM-TECH Corporation, testified the paint on the watch contained two elements, potassium and calcium, that were not present on the door paint. Powell also said appellant's watch could not have dented the steel apartment door without being significantly damaged or destroyed.

To rebut appellant's denial of taking his watch to be repaired or cleaned between the time of the alleged incident until he turned it over to the police over a month later, the State called an employee of the B.C. Clark jewelry store, who testified his records showed appellant had his watch cleaned and repaired on November 23, 1983, six days after the incident.

Appellant raises thirteen assignments of error, which we have condensed into eight.

## I.

### SUFFICIENCY OF THE INFORMATION

Appellant's first assignment of error asserts the Information was fatally defective because it omitted and inadequately described essential elements of Attempted Rape in Count I, and did not properly plead the offense of Forcible Sodomy in Count II. The State counters by stating the charges were adequate because they were cast in statutory language.

The basic criteria for determining the sufficiency of an Information or Indictment in Oklahoma were described in *Lamb v. State,* 626 P.2d 1355, 1356 (Okl.Cr.1981):

The test of the sufficiency of an Information is whether it alleges every element of the offense intended to be charged, and sufficiently apprises defendant of what he must be prepared to meet and so defines and identifies the offense that if convicted or acquitted will be able to defend himself against any subsequent prosecution of the same offense.

■ This pronouncement reflects a tripartite test, requiring a valid Information to include: (1) the essential elements of the offense charged [an "essential elements" test]; (2) a sufficient enough description of these elements to inform the defendant of the nature and cause of the charge [a "specificity" test]; and (3) a description

adequate enough to permit a later defense of former jeopardy [a "double jeopardy" test]. Our analysis will be confined to tests (1) and (2), since a later claim of double jeopardy is seldom based on the face of the Information or Indictment alone. *See Woodring v. United States*, 376 F.2d 619, 622 (10th Cir.1967).

■ *Essential Elements Test.* It is well settled that a criminal Information or Indictment is insufficient if it does not allege all the essential elements of the offense charged. *Hendricks v. State*, 698 P.2d 477, 480 (Okl.Cr.1985); *Johnston v. State*, 681 P.2d 90, 92 (Okl.Cr.1984). If any essential element is omitted, it cannot be supplied by intendment or implication or liberal construction. *Group v. State*, 94 Okl.Cr. 401, 236 P.2d 997, 1000 (1951); *State v. Sowards*, 64 Okl.Cr. 430, 82 P.2d 324, 328 (1938). Such an omission renders the Information incapable of charging a crime and so fatally defective that it cannot confer jurisdiction upon the trial court. *White v. State*, 582 P.2d 1334, 1335 (Okl.Cr. 1978). Moreover, these jurisdictional defects are not waived and may be raised at any time, even for the first time on appeal. *City of Tulsa v. Haley*, 554 P.2d 102, 103 (Okl.Cr.1976).

■ *Specificity Test.* In addition to describing the alleged crime in bare statutory language, the charging information for certain offenses must also specify the actual conduct or circumstances, or the thing or means used. *See Wirt v. State*, 659 P.2d 341 (Okl.Cr.1983); *Lamb v. State*, 626 P.2d 1355 (Okl.Cr.1982); *Davis v. State*, 354 P.2d 466, 471–72 (Okl.Cr.1960); *Courtney v. State*, 79 Okl.Cr. 206, 153 P.2d 243 (1944); *Allen v. State*, 63 Okl.Cr. 16, 72 P.2d 516 (1937).

These cited cases usually involved crimes containing a "generic" element; that is, crimes that contained elements encompassing too great a variety of conduct to be described sufficiently by the conclusory language of the statutes alone.

■ The general rule is that ambiguity and lack of specificity of an Information are not jurisdictional defects, and may be waived by not entering a proper and timely demurrer. *Allen v. State*, 734 P.2d 1304 (Okl.Cr.1987); *Pruitt v. State*, 670 P.2d 999 (Okl.Cr.1983). If not timely challenged, informations will always be liberally and aggressively construed. However, if the lack of specificity prevents the defendant from adequately preparing his defense, the defect can be raised later in the proceedings—even though a proper and timely demurrer was not filed. *Smith v. State*, 572 P.2d 262, 264–65 (Okl.Cr.1977); *Haley*, 554 P.2d at 103–04.

In applying these rules to this case, we note that the appellant timely filed his demurrer and repeatedly objected to the Information at every appropriate stage thereafter.

## A.

■ The essential elements of attempted first degree rape (Count I) are as follows: (1) an intent to commit first degree rape; (2) an overt, perpetrating act(s) toward commission of first degree rape; and (3) prevention or failure to consummate that crime. *See* 21 O.S.Supp.1983, §§ 1111(3), 1114(A)(3); 21 O.S.1981, § 42; *Oklahoma Uniform Jury Instructions—Criminal* (OUJI–CR) 210 (1981); *James v. State*, 711 P.2d 111, 113 (Okl.Cr.1985); *Menifee v. Page*, 423 P.2d 478, 484 (Okl.Cr.1967); *Perrin v. State*, 50 Okl.Cr. 237, 297 P. 314, 315 (1931).

Count I of the Information in this case states in relevant part:

ON OR ABOUT THE 17TH DAY OF NOVEMBER, 1983 ... THE CRIME OF ATTEMPTED RAPE IN THE FIRST DEGREE WAS FELONIOUSLY COMMITTED IN OKLAHOMA COUNTY, OKLAHOMA, BY [APPELLANT] ... WHO, WILFULLY AND KNOWINGLY ATTEMPTED TO HAVE SEXUAL INTERCOURSE WITH [J.R.B.] WHO WAS NOT HIS SPOUSE BY MEANS OF FORCE, OR BY MEANS OF THREATS OF IMMEDIATE AND GREAT BODILY HARM ACCOMPANIED BY APPARENT POWER OF EXECUTION, OR BY BOTH, BUT WAS PREVENTED FROM COMPLETING THE ACT BY

THE RESISTANCE OF THE VICTIM....

(O.R. 10)

1. *The Overt Act.* In *Menifee*, 423 P.2d at 484 (emphasis added), the Court held that,

> ... in order to constitute a good charge of attempt to commit the crime of rape, *it is necessary to aver in the information some act done toward the commission of the crime and failure. It is also necessary to aver, where the female is over the age of eighteen years, an intent to feloniously have sexual intercourse by committing rape* as defined by the Penal Code.

The State contends that the overt act was sufficiently described by the words, "attempted to have sexual intercourse with [J.R.B.] by means of force." These words merely repeat the legal definition of rape as set out in 21 O.S.Supp.1983, §§ 1111(3) and 1114(A)(3). As such, they are little more than a legal tautology—similar to stating that the defendant committed the crime of attempted rape by attempting to commit rape. The Information describes no overt physical act or actual personal threat towards the commission of the crime.

In *Menifee*, an earlier decision was approved which held invalid an attempted rape information, very much like this one, because it did not sufficiently specify the overt act. Further, in the early case of *Bond v. State*, 12 Okl.Cr. 407, 152 P. 809 (1915), the Court ruled that the actual overt act or acts must be pleaded in the information, and that merely alleging "attempting to have sexual intercourse" with the prosecutrix was insufficient. Other attempt cases have held the information invalid for failure to describe the actual act done, or mode and manner of the attempt. *E.g., Place v. State*, 300 P.2d 666 (1956) (attempted burglary); *West v. State*, 27 Okl.Cr. 125, 225 P. 556 (Okl.Cr.1924) (attempt to illegally manufacture whiskey).

However, in *Moulton v. State*, 476 P.2d 366 (Okl.Cr.1970), cited by some formbooks used by prosecutors, an attempted rape information was upheld even though it did not describe the overt act with specificity. The ruling can be largely explained by the fact that, unlike this case, a timely demurrer was not filed and every intendment, inference or presumption was used to sustain the information. Therefore, the *Moulton* allegations may be insufficient if properly and timely challenged.

Finally, in *State v. Bean*, 117 N.H. 185, 371 A.2d 1152 (1977), the New Hampshire Supreme Court faced a similar problem with an attempted rape information that failed to adequately allege an overt act, even though it described the offense in the words of the statute. In a well-reasoned opinion, it held that attempt charges must allege more than the applicable statutory language, since "attempt" is an indefinite term, embracing an inchoate offense. *Id.* 371 A.2d at 1153. "It is not sufficient to allege merely that the defendant 'unlawfully and feloniously' did attempt to commit a rape, by then and there attempting carnally to know the prosecuting witness, because such a charge does not set forth any physical act done towards the commission of the offense." *Id.*

In view of these authorities, we hold the Information was fatally defective in failing to describe the overt act with sufficient specificity.

■ 2. *The Specific Intent.* Even assuming *arguendo*, that a liberal construction might save the "overt act" deficiency, a thorough search of the language in Count I finds absolutely no mention of the requisite "intent" to commit rape—an essential element of attempted first degree rape.

The dispositive authority on this point is *Temple v. State*, 71 Okl.Cr. 301, 111 P.2d 524 (Okl.Cr.1941), which held the information failed to charge the defendant with attempted rape because it did not allege an "intent" to commit the crime. The *Temple* opinion then elaborated:

> It is alleged that he did 'wilfully, unlawfully and feloniously commit the crime of attempted rape in the first degree.' There is then set out the manner of force used by the defendant, and the indictment states that he did 'then and there

attempt to have and hold unlawful sexual intercourse with the said ...' Unless it is held that the word 'attempt' means 'intent,' there is nowhere alleged an intention on the part of the defendant to have intercourse with the prosecutrix.

*Id.* 111 P.2d at 526.

Informations in other assault and attempted rape cases, containing similar language, have also been held defective for omitting an allegation of "intent" to rape. *E.g., Johnston v. State,* 681 P.2d 90, 91–92 (Okl.Cr.1984); *Brockman v. State,* 60 Okl.Cr. 75, 61 P.2d 273, 278 (1936); *Herrick v. Terr.,* 2 Okl.Cr. 74, 99 P. 1096 (1909).

Therefore, the trial court erred in overruling the appellant's demurrer to Count I, and acquired no jurisdiction to try appellant under the invalid information. *See Smith,* 572 P.2d at 265. Accordingly, Count I must be reversed and remanded with instructions to sustain the demurrer thereto. *See Johnston,* 681 P.2d at 92.

### B.

■ Appellant next objects to that portion of the forcible sodomy count alleging unnatural carnal copulation by mouth with J.R.B., "BY FORCIBLY PLACING HIS MOUTH ON THE VAGINA OF [J.R.B.]" (O.R. 10) He claims that language fails to charge a crime under 21 O.S.Supp.1982, § 888, which requires "forcing another to engage" in the prohibited acts. That is, the allegation shows the force is directed toward the defendant, not J.R.B. Clearly, the language and the syntax are clumsy. But, however bad the grammar, the meaning is sufficiently clear from a reading of the charge. Force is alleged, as well as unnatural "copulation"—a term which, by definition, includes penetration. Therefore, the Information contains the elements of the offense and apprises the defendant of what he must be prepared to meet at trial. With regard to Count II, this assignment is without merit.

### II.

### PRIOR CONSISTENT STATEMENT

■ Appellant claims the trial court improperly admitted the testimony of Dr. J.

Don Harris, J.R.B.'s employer, who was allowed over objection to relate his conversation with a distraught J.R.B. at the hospital two days after the incident. This detailed account of the alleged assault was in substantial accord with J.R.B.'s in-court testimony. Appellant makes the same argument with regard to Dr. Fraley's testimony of the details of the incident as related to him by J.R.B. the day after the alleged assault. Appellant argues such testimony was inadmissible hearsay and improperly bolstered J.R.B.'s testimony.

"A statement is not hearsay if ... the declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge of recent fabrication or improper influence or motive...." 12 O.S.1981, § 2801(4)(a)(2). Here, J.R.B., the declarant, testified at trial and was subject to cross-examination concerning the statements. Also, the testimony of Dr. Fraley and Dr. Harris was consistent with J.R.B.'s testimony.

Treatise writers and case law also require that two foundational requirements must be met before such statements are admissible: "First, there must have been a suggestion that the witness has either fabricated his trial testimony or has been unduly influenced. Second, it must be established that the consistent statement was made prior to the time when there was a motive for the witness to lie or there was an exercise of improper influence." 1 L. Whinery, *Guide to the Oklahoma Evidence Code* 263 (1985). *See also Davis v. State,* 665 P.2d 1186, 1199 (Okl.Cr.1983); *United States v. Feldman,* 711 F.2d 758, 766 (7th Cir.1983); *United States v. Quinto,* 582 F.2d 224, 232–33 (2d Cir.1978).

The record reflects that during cross-examination of J.R.B. and in opening and closing argument, defense counsel impliedly charged that hope of a large financial settlement from appellant motivated J.R.B. and her attorney to fabricate her testimony. The record also reflects that J.R.B. related the same account of the incident to

Dr. Harris and Dr. Fraley *before* any overtures were allegedly made to appellant or his attorney to settle the matter financially. Consequently, while we are uncertain as to the precise grounds for the trial judge's admission of the Harris and Fraley statements, it was not error to admit them as prior consistent statements—either to rehabilitate J.R.B.'s in-court testimony or for the truth of the matters asserted therein.

### III.

### CONSTITUTIONALITY OF FORCIBLE SODOMY STATUTE

 Appellant claims the Oklahoma sodomy statutes, 21 O.S.1981, §§ 886, 888, are unconstitutionally vague and indefinite. This Court has consistently rejected such claims based on prior judicial construction of the sodomy statutes. *See Casey v. State*, 732 P.2d 885, 887 (Okl.Cr.1987); *Hicks v. State*, 713 P.2d 18, 19 (Okl.Cr. 1986); *Golden v. State*, 695 P.2d 6, 7 (Okl. Cr.1985). This assignment is without merit.

### IV.

### SUFFICIENCY OF THE EVIDENCE

 Appellant challenges the sufficiency of the evidence as to both counts, but because of our prior disposition of the attempted first degree rape count in Part I(A), we limit our discussion to the forcible sodomy count. We cannot say J.R.B.'s testimony was inherently improbable, contradictory, or unreasonable, so as to require corroboration. *See Taylor v. State*, 537 P.2d 434, 438 (Okl.Cr.1975); *Moore v. State*, 501 P.2d 529, 532 (Okl.Cr.1972). Although we are concerned about J.R.B.'s delay in reporting the assault and her statements that she was injured by falling down the stairs, such factors may be attributed to a fear of the appellant, the shame of public exposure, or a myriad of factors that often make women reluctant to report a sexual offense. *See* S. Brownmiller, *Against Our Will: Men, Women, and Rape* 387 (1975). We are also troubled by the allegedly large monetary demands made to settle the matter without prosecu-

tion. Nevertheless, the circumstances were not sufficient to render her testimony inherently improbable. For the credibility of the victim is for the jury to determine, provided such testimony is sufficiently clear and convincing or corroborated. *Bruner v. State*, 612 P.2d 1375, 1379 (Okla. Crim.App.1980).

In any event, her testimony was corroborated by physical evidence of a struggle, including the scratched and dented door, a "reddish" stain on the tile floor, a partial hair consistent with appellant's found in J.R.B.'s bedroom, and J.R.B.'s injuries. Expert testimony indicated that paint chips found on appellant's watch matched the paint on the inside of J.R.B.'s apartment door. The fact that no fingerprints or blood directly implicating appellant were found at the scene, is not conclusive and does not render J.R.B.'s testimony unreliable. *See Binder v. State*, 717 P.2d 1143, 1145–46 (Okl.Cr.1986). There was direct testimony of oral penetration accomplished by the use of force and fear by appellant against J.R.B., and this evidence was sufficient to establish forcible sodomy. *See Peninger v. State*, 721 P.2d 1338, 1341 (Okl.Cr.1986).

Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found the essential elements of forcible sodomy beyond a reasonable doubt. *See Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985). This assignment is without merit.

### V.

### MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

 Next, appellant claims that a new trial should have been granted based on newly discovered evidence. To warrant a new trial on that basis, one must demonstrate that the evidence is material, could not have been discovered with due diligence before trial, is not cumulative, and creates a reasonable probability of changing the outcome. *Sheppard v. State*, 731 P.2d 989, 990 (Okl.Cr.1987).

The affidavit of Mr. Roberts, a B.C. Clark employee, offered at the motion for new trial, claiming he discovered the repair ticket showing that appellant's watch was delivered to B.C. Clark by an employee, and not appellant himself, does not create a reasonable probability of changing the outcome. The relevant fact was that the appellant's watch was damaged and repaired only five days after the attack on J.R.B. *See Marlow v. City of Tulsa,* 564 P.2d 243, 245 (Okl.Cr.1977).

Appellant also claims that new tests show that the paint chips found on appellant's watch were similar to the paint in appellant's pool. Appellant had ample opportunity to run such tests before trial, but failed to do so. Thus, he has failed to establish that the evidence could not have been discovered with due diligence before trial. *See United States v. Palmer,* 766 F.2d 1441, 1445 (10th Cir.1985). *Mitts v. State,* 345 P.2d 913, 919 (Okl.Cr.1959). The affidavit of Mr. Garland Holmes, appellant's expert technician, offered at the new trial hearing, to the effect that particles on the watch would have been removed during the cleaning process, is merely cumulative to the evidence presented at trial that the watch had been cleaned during the repair by B.C. Clark, and does not warrant a new trial. Having reviewed each of appellant's claims of newly discovered evidence, we have concluded that none fall within the requirements of *Sheppard,* 731 P.2d at 990.

With regard to appellant's claim that the State withheld exculpatory evidence consisting of the fact that the District Attorney's Sexual Assault Program had referred J.R.B. to a psychologist for counseling, and that J.R.B. had eight therapy sessions before trial, we note that the statement given by J.R.B. to police, nearly two months before the therapy sessions, were not materially different from her testimony at preliminary hearing or trial. Even though the evidence may have had some impeachment value, we cannot say appellant has demonstrated "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682–83, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985).

## VI.

### STATE'S REOPENING

Appellant next asserts the trial court erred in allowing the State to reopen and recall FBI chemist Robert Webb to testify and introduce gas chromatograph charts, reflecting the paint test results he had described in his testimony in the State's case-in-chief. After both sides had rested, the charts were offered as rebuttal evidence. The trial court sustained an objection to them as improper rebuttal, but then allowed the state, over appellant's further objection, to reopen its case and introduce the charts.

In Oklahoma, it has long been the general rule that "the reopening of a criminal case after both sides have rested, for the purpose of introducing further evidence, is a matter of discretion with the trial court." *Zackery v. State,* 572 P.2d 580, 588 (Okl.Cr. 1977). In the absence of a clear abuse of discretion, which is not present here, we will not disturb the trial court's ruling. *Morgan v. State,* 545 P.2d 1265, 1269 (Okl. Cr.1976).

## VII.

### INSTRUCTIONS

In light of our disposition of the attempted rape charge, we address only the arguments relating to the sodomy charge. We find that the credibility and forcible sodomy instructions given by the trial court, although not as detailed as appellant's requested instructions, when taken as a whole, fairly and accurately stated the applicable law. *See Redden v. State,* 739 P.2d 536, 538 (Okl.Cr.1987); *Allen v. State,* 674 P.2d 1149, 1150 (Okl.Cr.1984).

## VIII.

### PROSECUTORIAL MISCONDUCT

In his fifth and tenth assignments of error, appellant claims that he was de-

nied a fair trial because of several instances of prosecutorial misconduct. With regard to the objections that were sustained by the trial court, and for which the jury was admonished to disregard, we believe such was sufficient to preclude a finding of prejudicial error. *Vanscoy v. State,* 734 P.2d 825, 830 (Okl.Cr.1987). While some of the comments are not to be condoned, we cannot say they were so grossly improper as to require reversal or modification. *See Fisher v. State,* 736 P.2d 1003, 1009 (Okl. Cr.1987); *Williams v. State,* 733 P.2d 22, 25 (Okl.Cr.1987).

A defendant is entitled to a fair trial, not a perfect one. *Jones v. State,* 610 P.2d 818, 820 (Okl.Cr.1980). Consequently, we find the alleged misconduct does not constitute reversible error.

On the basis of the foregoing, the judgment and sentence on Count I for attempted first degree rape is REVERSED and REMANDED to the District Court of Oklahoma County with instructions to sustain the demurrer to the information. The judgment and sentence on Count II for forcible sodomy is AFFIRMED.

PARKS, J., concurs.

BRETT, P.J., specially concurs.

BRETT, Presiding Judge: specially concurring.

With reference to the reversal of the Attempted Rape Conviction, I concur without reservations. However, concerning the Sodomy Charge, I am compelled to state that because of *stare decisis* I concur in the affirmance of this conviction. See *Golden v. State,* 695 P.2d 6, 7 (Okl.Cr. 1985).